# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FLOYD E. LYTES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 05-402 (RMC)** |
| ) | |
| **DISTRICT OF COLUMBIA** ) | |
| **WATER AND SEWER AUTHORITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION

Floyd E. Lytes claims that the District of Columbia Water and Sewer Authority ("WASA") discriminated against him when it refused to return him to work as a Wastewater Treatment Plant Operator and then terminated him, allegedly because of his physical disability. At the close of discovery, WASA moves for summary judgment on Count II of the Complaint, the only remaining claim in this case, which Mr. Lytes resists. The Court concludes that Mr. Lytes was not "disabled" within the meaning of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*., either at the time WASA denied him a light duty/sedentary position in September 2003, or when it terminated him in March 2004. The Court finds that Mr. Lytes' discharge, when he could not locate a vacant position at WASA for which he was qualified, was lawful. Accordingly, the Court will grant Defendant's Motion for Summary Judgment and dismiss Plaintiff's remaining claim with prejudice.

## I.  BACKGROUND

WASA manages water distribution and sewage collection in the District of Columbia

and other parts of the D.C. metropolitan area.  Wastewater is collected by the D.C. sewer system and

from the Maryland and Virginia suburbs and delivered to the Blue Plains Advanced Wastewater

Treatment Plant operated by WASA.  The Plant, which is the largest advanced facility of its kind in

the world, covers 150 acres and treats an average of 370 million gallons of wastewater per day.  It

has the capacity to treat 1.076 billion gallons of wastewater per day during inclement weather.  The

wastewater treatment process consists of primary treatment, secondary treatment,

nitrification/denitrification, effluent filtration, chlorination/dechlorination, and post aeration.

A.    **Mr. Lytes' Employment with WASA**

Mr. Lytes was hired as a Wastewater Treatment Plant Operator at the Blue Plains

Treatment Plant on June 6, 1985, by WASA's predecessor, the D.C. government.  He became an

employee of WASA when that agency was created in 1996.  His job duties consisted of "taking daily

readings of equipment," obtaining and analyzing samples from all phases of the treatment processes,

"hosing down tanks, and turning pumps on and off."  Compl. ¶ 10.  WASA requires its Operators

"to be competent in performing" operating procedures and tasks as assigned "in any major area of

the plant, including primary treatment, secondary treatment, nitrification, filtration and disinfection,

sludge thickening, digestion, and dewatering."  Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s

Mem."), Ex. C.  During Mr. Lytes' tenure as a plant operator, the applicable job specified:

"[c]onstant standing or walking for an eight hour shift may be required;" "[c]limbing is required to

reach raised operating area;" [l]ifting of heavy or cumbersome objects is occasionally required;" and

"working in awkward positions is occasionally required when performing cleaning, minor

maintenance, and other duties as assigned."  *Id*.  Plant operators work indoors and outdoors in all

weather conditions on a rotating shift schedule.  *Id.*  Operators may be "required to work mandatory

overtime under unusual conditions." *Id.*

In connection with a disability retirement application, completed in December 2002, Mr. Lytes certified that his position as a Wastewater Treatment Plant Operator required him to perform "intensive physical duties on the job." Def.'s Mem., Ex. B (deposition transcript of Floyd Lytes ("Lytes Dep.")) at 178-83 & Exs. 11-12. Similarly, Mr. Lytes testified at his deposition that forty percent (40%) of the job duties of an Operator are not sedentary. Lytes Dep. at 99.

> **B.      Mr. Lytes' Injury and Medical Treatment**

While working on May 7, 2000, Mr. Lytes lifted a chair and "felt a sudden sharp pain in his lower back." Compl. ¶¶ 12-13. Several hours later, he felt "severe pain" in his lower back. *Id*. at ¶ 13. Medical tests revealed degenerative disc disease with a herniated disc. *Id*. at ¶¶ 14-15; *see also* Def.'s Mem., Ex. D (deposition transcript of James Tozzi, M.D. ("Tozzi Dep.")) at 7-8 & Ex. 1 at 1. Mr. Lytes underwent a lumbar diskectomy on December 8, 2000. Tozzi Dep. at 7-10 & Ex. 1 at 3-4. Six weeks later, Dr. Tozzi noted, "[G]iven his chronic disk degenerative process that is well seen on his studies, his obesity and the type of his work, we might have to consider having him find work in a less physically demanding job." Tozzi Dep. at 7-8 & Ex. 1 at 5.

Things went from bad to worse for Mr. Lytes when he suffered a heart attack and underwent an angioplasty on February 27, 2001. Tozzi Dep. at 18 & Ex. 1 at 6. His cardiologist released him to resume exercise in April 2001. Tozzi Dep., Ex. 1 at 6. Upon completion of his rehabilitation program, at the request of WASA's workers' compensation insurance carrier, Liberty Mutual, Mr. Lytes underwent an independent medical examination by Dr. James Callan on July 19, 2001. Tozzi Dep. at 23-25 & Ex. 2. Although Dr. Callan opined that Mr. Lytes was "capable of returning to his usual job with no restrictions other than to follow generally acceptable back

principles when lifting, pushing, or pulling," Dr. Tozzi disagreed.  Tozzi Dep. at 24-25 & Ex. 2.  Dr.

Tozzi recommended that Mr. Lytes "be restricted to light duty" and that he "avoid heavy manual

labor and repeated bending, twisting, and lifting."  Tozzi Dep. at 78, 23-24 & Ex. 1 at 9.  Mr. Lytes

continued to experience back pain and Dr. Tozzi recommended spinal fusion surgery, which

occurred on June 5, 2002.  Tozzi Dep. at 7-8, 33-36 & Ex. 1 at 10-16.  On August 16, 2002, Dr.

Tozzi endorsed Mr. Lytes' application for a Maryland handicap parking placard for six months,

writing that he "is recovering from spinal surgery done by me on 6/5/02 and is unable to walk any

distance at this time."  Tozzi Dep. at 39 & Ex. 4.

On December 4, 2002, Mr. Lytes completed an Applicant Statement of Disability, in

which he described his condition:

> Due to my condition I have been forced into a sedentary lifestyle. As a
> result of my injury, basic everyday tasks have become arduous feats.  I am
> not able to bend or lift more than 5 pounds.  I am in constant discomfort
> regardless of whether sitting or standing.  I am unable to sleep through the
> night without waking up in pain.  My physical ability has been greatly
> curbed due to my condition.  I am also unable to walk short distances, climb
> stairs, stretch, or reach without pain.

Lytes Dep. at 178-83 & Exs. 11-12.  Despite this application, Dr. Tozzi cleared Mr. Lytes for

sedentary duty and released him to return to work in a "sedentary job" on January 6, 2003.  Tozzi

Dep. at 7-8, 41, 51-52.  Dr. Tozzi indicated that Mr. Lytes could stand or walk for a maximum of

2 to 4 hours during an 8-hour shift, could lift 5 to 10 pounds occasionally, but could not bend or

squat.  Tozzi Dep. at 44-48 & Ex. 5.  At the request of Liberty Mutual, Mr. Lytes was examined by

Dr. Callan on January 10, 2003, after which Dr. Callan again concluded that Mr. Lytes was capable

of returning to work with no restrictions other than to follow generally accepted back principles.

Def.'s Mem., Ex. E (deposition transcript of Tanya DeLeon ("DeLeon Dep.")) at 49-51 & Ex. 2.

Obviously, Drs. Tozzi and Callan had divergent views on Mr. Lytes' condition as of January 2003.  As a result, Liberty Mutual sought and received Dr. Tozzi's authorization for Mr. Lytes to undergo a functional capacity evaluation, which is designed to assess an individual's physical capabilities and limitations.  Tozzi Dep. at 53-54 & Ex. 7.  As part of that evaluation, Mr. Lytes reported that "he spends 20% of his day lying down, 60-70% of his day sitting; 10-20% of his day standing and walking."  Tozzi Dep. at 54-55 & Ex. 8.  He also stated that he engages in such activities as "driving his mother to church at 10 am and bringing her back at 11 am; reading the paper; walking either outside in his neighborhood or inside on his treadmill for a total of 15 minutes and sometimes more at least twice a day; watching tv; [and] doing some light cleaning."  Tozzi Dep., Ex. 8.

During the functional testing, Mr. Lytes "demonstrated mild restricted standing and walking tolerances as well as functional deficits in squatting, bending, ladder climbing, and overhead reaching."  Tozzi Dep. at 54-55 & Ex. 8.  In particular, he stood for 18 minutes, sometimes leaning on furniture; walked one-half mile in 12 minutes, although he experienced some low back pain; lifted objects that ranged in weight from 5 to 15 pounds; pushed and pulled objects weighing 45 and 43 pounds, respectively; did not complete the bending, climbing and reaching tasks due to pain; and refused to crawl or kneel.  Tozzi Dep., Ex. 8.

Mr. Lytes described "his previous full duty job as a Waste Water Plant Operator at the MEDIUM Physical Demand Level with the requirement to occasionally lift and carry objects weighing up to 50 [pounds].  And to occasionally perform custodial duties as well as to do light repair work as needed."  *Id.*  The functional testing placed him at "the SEDENTARY-LIGHT Physical Demand Level with functional deficits and a workplace tolerance of 8 hours."  *Id.*

Accordingly, the functional capacity evaluation concluded that Mr. Lytes' "functional deficits in lifting, carrying, ladder climbing, standing, and walking all prevent him from returning to his previous full duty job as a Waste Plant Operator at this time."  *Id.*  Dr. Tozzi concurred and maintained that Mr. Lytes was capable of returning only to sedentary work.  Tozzi Dep. at 7-8, 58, 65-66 & Ex. 1 at 21.

The record suggests that Mr. Lytes' condition did not materially improve by March 2003 as Dr. Tozzi once again endorsed his application for a Maryland handicap parking placard, stating it was "still difficult for Mr. Lytes to walk any distance without assistance."  Tozzi Dep. at 63-64 & Ex. 10.  He examined Mr. Lytes again on September 2, 2003, at the request of Liberty Mutual, for a rating of future employability.  At that time, Dr. Tozzi made the following observation:

> It is my opinion that Mr. Lytes is improved as a result of his surgery.  He has some residuals that could probably be made less of a problem for him if he [were] to lose more weight and become more conditioned.  Given his current appearance and current physical abilities and taking into account his prior surgery, I feel that he would be safe to perform light duty and sedentary work.  I do not feel that these restrictions will change appreciably in the near future and do feel that these restrictions are primarily to avoid recurrent injury to the unfused segments of his spine.

Tozzi Dep. at 7-8, 66 & Ex. 1 at 23.  Dr. Tozzi reaffirmed his agreement with the results of the January 2003 functional capacity evaluation and opined that Mr. Lytes had reached maximum medical improvement.  Tozzi Dep. at 71-74 & Ex. 12.

On December 1, 2003,  Dr. Tozzi examined Mr. Lytes and noted, "He stands erect and walks without a limp.  He has some discomfort in his back, with extension and flexion, but no significant limitation."  Tozzi Dep. at 7-8 & Ex. 1 at 24.  A subsequent exam on January 8, 2004 led Dr. Tozzi to conclude that Mr. Lytes' physical restrictions prevented him from returning to his job

as a Wastewater Treatment Plant Operator but did not preclude him from all work.  Tozzi Dep. at

80-81.  Dr. Tozzi noted:

> I feel that Mr. Lytes has residuals of lumbar disk and fusion surgery.  These
> residuals are that of weather ache, stiffness, and some night discomfort with
> paresthesias[1] in the left leg.  While his impairment is not great when rated
> based upon neurological deficit, sensory impairment, pain, and stiffness, it
> is an impairment sufficient enough to interfere with manual labor.  It is my
> understanding that his current occupation and previously offered positions
> were not within the area of his capabilities and that his physical restrictions
> prevented him from working in those prior capacities.  I do feel, however,
> that even though he has an impairment, he should be able to work with
> some restrictions.  If these restrictions are too significant or too restrictive
> to allow him to return to his former [job] as they appear to be [and] do not
> allow him to find gainful employment, then he is clearly impaired for his
> former occupation.  In the absence of finding other work for him, then he
> would be impaired for work.  However, he is not impaired for all work, and
> if his employer or comp carrier could find for him work within the limits of
> his restrictions, he should be able to be gainfully employed once again.  If
> not, then he is impaired and disabled at this time.  I would not expect an
> appreciable change in the future.

Tozzi Dep. at 69-70 & Ex. 8.  At that time, Mr. Lytes complained to Dr. Tozzi of "back discomfort

which will occasionally interfere with sleep and some intermittent left leg tingling."  Tozzi Dep., Ex.

8.

## C.     Mr. Lytes' Requests to Return to Work

Mr. Lytes first contacted Tanya DeLeon, WASA's Risk Manager, in November 2002

about returning to work.[2]  At that time, Dr. Tozzi had not yet released Mr. Lytes to return to work

---

[1]  Paresthesia: "a sensation of pricking, tingling, or creeping on the skin having no
objective cause and use.  Associated with injury or irritation of a sensory nerve or nerve root."
Webster's Third New Int'l Dictionary (2002).

[2]  Mr. Lytes recalls that he met personally with Ms. DeLeon on January 3, 2002, spoke
with her by phone in February 2002, and met with her in her office in March 2002.  However,
Ms. DeLeon did not become employed by WASA until September 20, 2002.  *See* Def.'s Mem. at
12 & n.7.  This discrepancy is irrelevant for the pending motion.

after his second back surgery.  Tozzi Dep. at 7-8 & Ex. 1 at 19.  Mr. Lytes contacted Ms. DeLeon

a second time and met her at her office on September 3, 2003 to discuss Dr. Tozzi's release of Mr.

Lytes to return to work to sedentary or light duty.  Lytes Dep. at 81-86, 89-93, 98-99; Lytes Aff. ¶

4.  He requested that he be allowed to return to work as a Wastewater Treatment Plant Operator

performing only sedentary or light duty work or having assistance in opening and closing valves.

Lytes Dep. at 90-91, 98-99.  Ms. DeLeon responded that light duty was not available.  *Id*. at 84;

Lytes Aff. ¶ 4 ("De[L]eon refused any type of accommodation").   These were the only two

occasions on which Mr. Lytes asked to return to work.  Lytes Dep. at 192.

   Because of the limitations required by Dr. Tozzi, and the unlikelihood that Mr. Lytes'

condition would improve over time, WASA sent Mr. Lytes a letter on December 16, 2003, notifying

him that he had been medically disqualified from his position as a Wastewater Treatment Plant

Operator as a result of his occupational injury and work restrictions.  *Id*. at 103-04 & Ex. 5.  The

letter advised Mr. Lytes that he had 60 days in which to find another position at WASA for which

he was qualified in order to maintain his status as a full-time regular employee.  Lytes Dep., Ex. 5.

He was also advised that he should contact Derek Jones in WASA's Office of Human Resources to

obtain vacancy announcements for available positions.  *Id*.

   Mr. Lytes contacted Mr. Jones and learned that WASA's vacancy announcements

were posted online.  Lytes Dep. at 104-06.  Mr. Lytes thereafter applied for an engineering tech

position in WASA's engineering services department because it paid at least as much as his former

position as a Wastewater Treatment Plant Operator.  *Id*. at 108-09.  He was not qualified for the

engineering tech position, however, because he did not have the necessary college degree.  *Id*. at 108.

This was the only WASA vacancy for which he applied.  *Id*. at 109.

On March 24, 2004, WASA notified Mr. Lytes via letter that he was being terminated effective March 25, 2004. *Id*. at 202-03 & Ex. 17. The letter stated as cause that Mr. Lytes was "permanently unable to perform the essential functions of the position of Wastewater Treatment Plant Operator" and that he had not found alternate employment in the last 60 days. Lytes Dep., Ex. 17.

Mr. Lytes filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 23, 2004. His charge alleged:

> I suffered a work related injury in 2000 which resulted in two operations. The last operation was performed in 2002. I was released for light duty around September 3, 2003. My employer told me that there was no light duty but I believe that there were light duty functions that I could perform. Around December 16, 2003, I was medically disqualified by my employer from my position as a Plant Operator. I was given 60 days to find another position. I believe that there were other positions for which I could qualify but I was not placed into any of these. On March 24, 2004, I was terminated.

Lytes Dep., Ex. 18. The EEOC issued a notice of right to sue to Mr. Lytes on November 29, 2004. Lytes Dep., Ex. 19. This lawsuit followed.

On March 30, 2006, this Court dismissed all but one of Mr. Lytes' claims. Mr. Lytes' sole remaining claim is Count II of the Complaint, which asserts violations of the ADA and Rehabilitation Act, based on WASA's alleged failure to accommodate Mr. Lytes' alleged disability, and based on his allegedly improper termination.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable,

-10-

or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  ANALYSIS

The parties have litigated this case to a fare-thee-well but the Court finds that the merits can be resolved on the threshold issue of whether Mr. Lytes was actually disabled within the meaning of the ADA[3] at the time that WASA denied him a light duty/sedentary position in September 2003 and when it terminated him as medically unfit in March 2004.  If he were not a qualified individual with a disability, he would not be covered by the ADA.

To establish a prima facie case of unlawful discrimination based on a failure to reasonably accommodate, Plaintiff must show, by a preponderance of the evidence, that: (1) he is a qualified individual with a disability; (2) the employer had notice of his disability; (3) there was some reasonable accommodation denied to him; and (4) such accommodation would have enabled him to perform the essential functions of his job.  *See Nichols v. Billington*, 402 F. Supp. 2d 48, 78 (D.D.C. 2005).  To establish a prima facie case of unlawful discrimination based on disparate treatment, Plaintiff must show, by a preponderance of the evidence, that: (1) he had a disability

---

[3] The Court only evaluates the merits of Mr. Lytes' claims under the ADA and hereby dismisses Mr. Lytes' claims under the Rehabilitation Act.  Section 501 of the Rehabilitation Act only applies to federal agencies of the executive branch and, therefore, is inapplicable to WASA. 29 U.S.C. § 791.  Section 504 of the Rehabilitation Act prohibits "any program or activity" that receives "[f]ederal financial assistance" from discriminating against a "qualified individual with a disability" solely because of the individual's disability.  29 U.S.C. § 794(a).  In no pleading does Plaintiff allege facts that establish the applicability of Section 504 of the Rehabilitation Act to WASA.  Moreover, Plaintiff does not address his claim under the Rehabilitation Act in his Opposition to Defendant's Motion for Summary Judgment (Pl.'s Opp'n), thereby conceding that he cannot pursue such a claim.  *See Fed. Deposit Ins. Corp. v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (on summary judgment, a court may treat those arguments that the plaintiff failed to address as conceded pursuant to LCvR 7.1(b)).

within the meaning of the ADA; (2) he was qualified for the position with or without reasonable accommodation; and (3) he suffered an adverse employment (i.e., termination) because of his disability. *See Duncan v. Washington Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001).

The ADA defines "disability" as: (A) "a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Under the ADA, Mr. Lytes bears the burden of proving that he was disabled. *See Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004); *Nichols*, 402 F. Supp. 2d at 78. Mr. Lytes relies upon the first and third prongs of the statutory definition in asserting that he was disabled during the time periods at issue. For the reasons stated below, this Court concludes that Mr. Lytes was not an individual with a qualified disability within the framework of the ADA.

1.      Was Mr. Lytes "Disabled"?

In his most recent reports in the record, Dr. Tozzi stated that Mr. Lytes has an impairment. *See* Tozzi Dep. at 69-70 & Ex. 8. An impairment alone is insufficient to meet the ADA's definition of disability. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195 (2002). Rather, a plaintiff must demonstrate that the impairment limits a "major life activity" and that the limitation is "substantial." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 656 (D.D.C. 1997); *Thompson v. Rice*, 422 F. Supp. 2d 158, 169 (D.D.C. 2006). "Major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working." 29 C.F.R. § 1630.2(i).[4]  The Supreme Court has instructed that a major life activity must

be "substantially" limited, meaning that the limitation must be "considerable" or "specified to a large

degree." *Sutton*, 527 U.S. at 491.

In September 2003, Dr. Tozzi opined that Mr. Lytes could return to work in light duty

or sedentary positions.  Dr. Tozzi told Liberty Mutual, "[g]iven his current appearance [obesity] and

current physical abilities and taking into account his prior surgery, I feel that he would be safe to

perform light duty and sedentary work.  I do not feel that these restrictions will change appreciably

in the near future and do feel that these restrictions are primarily to avoid recurrent injury to the

unfused segments of his spine."  Tozzi Dep., Ex. 8.  At that time, Mr. Lytes had informed Dr. Tozzi

that "he ha[d] ongoing discomfort in the back.  He ha[d] a little trouble sleeping.  He [did] not have

much in the way of leg pain."  *Id*.  Dr. Tozzi observed:

> [Upon examination, Mr. Lytes] stood upright, had a level pelvis, and
> walked without a limp.  He had lumbar flexion to 60, extension of 20, and
> lateral bending of 20 without much in the way of pain other than tightness.
> Straight-leg raise produced no pain.  Hip rotation was painless.  Sensation
> was reported as equal throughout.

*Id*.  It appears that the restrictions ordered by Dr. Tozzi may not have been actually required by Mr.

Lytes' condition but were desirable "to avoid recurrent injury."  *See id*.  Dr. Tozzi's notes reflect a

similar evaluation in January 2004.  *Id*. (observations of "back discomfort which will occasionally

interfere with sleep and some intermittent left leg tingling").  Mr. Lytes' impairment was not great

but was sufficient to counsel against a job that required manual labor.

---

[4] The United States Supreme Court has questioned whether "working" qualifies as a
major life activity, *Sutton v. United Airlines*, 527 U.S. 471, 492 (1999), but that debate need not
be addressed here since both Mr. Lytes and Dr. Tozzi agree that he could work, at least at light
duty and/or sedentary positions.

Restrictions to sedentary or light duty are insufficient to substantially limit Mr. Lytes in a major life activity as the ADA has been interpreted and applied. Although the ADA does not define the term "substantially limits," courts "'require that an individual be unable to perform a major life activity that the average person in the general population can perform' or [be] 'significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the average person in the general population." *Heasley v. Dist. of Columbia Gen. Hosp.*, 180 F. Supp. 2d 158, 166 (D.D.C. 2002); *see also Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997) ("general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA"); *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 142-43 (D.D.C. 2004) ("[A] person whose daily life activities are not substantially limited, even though her performance at work is subject to physical limitations, is not disabled."). In light of Dr. Tozzi's findings of some back pain and leg tingling, no reasonable jury could conclude that Mr. Lytes was limited in a major life activity in either September 2003 or March 2004.

Mr. Lytes argues that his pain and physical restrictions demonstrate an actionable disability. Pl.'s Opp'n at 16. It is certainly true that Mr. Lytes *had* a disability at the time of his injury and for some years thereafter. Mr. Lytes explains that "[a]t one point, [he] was unable to perform every day tasks such as walking, cooking, [and] bathing." *Id*. at 17. Admittedly, however, these kinds of restrictions no longer intrude. What he relies on in this case instead are "the restrictions in not being able to bend consistently, carry heavy weights, reach or twist" which restrict his work life and his private life chores. *Id. (*Mr. Lytes "cannot or should not mow the law for long periods, no squatting or bending to repair any pipes at home."). These limitations do not affect Mr.

-14-

Lytes' abilities to perform major life functions; mowing the law, squatting and bending, and pipe repair are not major life activities. *See Marinelli v. City of Erie*, 216 F.3d 354, 362-63 (3d Cir. 2000) (housework not a major life activity); *Nuzum v. Ozark Auto Distrib., Inc.*, 320 F. Supp. 2d 852, 862-63 (S.D. Iowa 2004) ("mowing the lawn, doing yard work, and performing other unidentified outside chores" and "lifting a laundry basket and other household chores involving lifting heavy items" are not major life activities).

The relevant time for assessing a claim of disability is when an accommodation is requested. *Heasley*, 180 F. Supp. 2d at 167. Therefore, it is not relevant that Mr. Lytes was once truly disabled. He did not qualify as disabled according to the ADA in September 2003, when he requested light duty/sedentary duty, or in March 2004, when he was discharged.

2.    <u>Was Mr. Lytes Perceived As Disabled</u>?

In order to proceed under a "perceived disability" theory, Mr. Lytes "must show that: (1) he was perceived to have a physical impairment and (2) the impairment was perceived to substantially limit one or more of [his] major life activities." *Siragy v. Georgetown Univ.*, 1999 US. Dist. LEXIS 21021, *14 (D.D.C. Aug. 20, 1999) (internal citations and quotations omitted). Mr. Lytes argues that Ms. DeLeon's assumption that he would never return to work means that WASA perceived him as disabled under the third prong of the ADA definition. *See* Pl.'s Opp'n at 15. There is no factual basis for this statement in the record and the argument of counsel does not constitute evidence.

Courts agree that the "mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel Univ.*, 94 F.3d 102,

109 (3d Cir. 1996); *see also Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993) (employer's belief that plaintiff could not perform a particular task safely was insufficient to prove perception of disability); *Prickett v. Amoco Oil Co.*, 147 F. Supp. 2d 1147, 1155 (D. Utah 2001) (defendant did not regard plaintiff as disabled simply because it recognized plaintiff's limitations). Mr. Lytes argues that WASA required him to undergo a functional capacity evaluation and that when "he failed that test, WASA concluded that [his] physical capabilities were limited, hence disabled." Pl.'s Opp'n at 15-16.   The argument misconstrues the law.   While it is true that Mr. Lytes has some limitations on his physical capabilities, he is not disabled because those limitations do not affect a major life activity.   Still less does the argument demonstrate or prove that WASA regarded Mr. Lytes as disabled.   WASA did not terminate Mr. Lytes after the functional capacity evaluation.   Instead, WASA accepted Mr. Lytes' conclusion that he could not perform manual tasks as of January 2003. *Id.* at 15.   His leave while receiving workers' compensation continued until Liberty Mutual asked, in September 2003, for an evaluation of his future tenure at WASA.   Only after Dr. Tozzi repeatedly advised that Mr. Lytes had recovered but still had limitations that prevented him from performing all the essential tasks of a Wastewater Treatment Plant Operator,[5] did WASA tell Mr. Lytes that he was medically unqualified for his former job and offer him a 60-day period to find a new position at WASA.   Lytes Dep. at 103-04 & Ex. 5.   These are not the actions of an employer that perceived Mr. Lytes as disabled.   *See Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 524-25 (1999);

---

[5]   Counsel for Mr. Lytes argues that the Operator's job had been automated during Mr. Lytes' leave period so that the jobs now constitute light duty.   Pl.'s Opp'n at 2.   His evidence for this is meager, coming from several affidavits.   Nonetheless, he does not deny that it is necessary for Operators in the Secondary Branch to climb 50 or more steps, turn valves on and off, get into constricted spaces, and work long hours at a hurried pace during inclement weather.   *Id.*   These are the sorts of essential duties that an Operator must perform and that Mr. Lytes cannot.

*Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110, 117 (1st Cir. 2004).

## IV.  CONCLUSION

Mr. Lytes suffers from back pain that interferes on occasion with his sleep and he experiences occasional tingling in his left leg.  With some of his vertebrae fused, he has limited ability to bend, stoop, or twist.  These limitations do not prevent him from working at all jobs but they do prevent him from performing the essential tasks of an Operator at the Blue Plains Wastewater Treatment Plant.  These recognized limitations do not constitute a disability within the framework of the ADA, and Mr. Lytes has presented no evidence that WASA perceived him as disabled.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment [Dkt. # 33], and dismiss the remaining claim in the Complaint (Count II).  All other pending motions will be denied as moot and this case will be dismissed.  A memorializing order accompanies this Memorandum Opinion.


Date: December 13, 2007                         _____/s/_____

                                                ROSEMARY M. COLLYER
                                                United States District Judge